GRITT, JUDGE:
Claimants brought this action for personal injuries received by claimant James Brown, for loss of consortium suffered by claimant Angela Brown, his wife, and for loss of comfort suffered by his children, claimants Christine Brown and Tasha Brown, when claimant James Brown had an accident while operating a motorcycle on Tony’s Branch Road, also designated as State Route 3/2, near the community of Bloomingrose in Boone County. The respondent was at all times herein responsible for the maintenance of Tony’s Branch Road. The Court is of the opinion to make an award in this claim for the reasons stated herein below.
The facts of this claim establish that on June 5,1999, claimant James Brown and his wife, claimant Angela Brown, were attending a graduation party being given by one of Mr. Brown’s coworkers. The location of the party was on Tony’s Branch Road, a two-lane asphalt road which is a dead-end road extending from W. Va. State Route 3. The claimant and his wife arrived at the party at approximately 7:00 p.m., having driven there *32 in their 1984 Chevrolet Blazer with two passengers, Mr. Brown’s brother and his wife. Mr. Brown drove the Blazer to the party. At around 9:00 p.m., Paul Foster and his girlfriend arrived at the party riding on Mr. Foster’s 1991 Heritage Soft Tail Harley Davidson motorcycle. After being at the party a few minutes, Mr. Brown asked permission to ride the motorcycle and Mr. Foster gave his permission. Thereupon, Mr. Brown rode the motorcycle to the dead-end ofTony’s Branch Road, turned around and proceeded toward the intersection ofTony’s Branch Road and W.Va. State Route3. He turned around in an adjacent yard prior to the intersection to proceed back to the party. On this return trip, claimant James Brown encountered a cut made in the roadway during the installation of two culverts beneath Tony’s Branch Road by employees of the respondent. At the location of the cut, a depressed area had developed and the motorcycle went into the depressed area. At that moment, claimant James Brown lost control of the motorcycle whereupon he proceeded down the road some distance and went into the ditch on the left side of the road, traveling some seventy (70) feet in the ditch and then he fell from the motorcycle which pinned him on the ground. The people in attendance at the party were informed of the accident and several of them went to the scene, including claimant Angela Brown. They found the claimant some ten (10) to twelve (12) feet from the motorcycle. An ambulance was summoned to take him to the hospital in Charleston and a law enforcement official came to the scene to perform an accident investigation. Claimant James Brown sustained severe injuries as a result of this accident.
Claimants allege that respondent was negligent in its maintenance ofTony’s Branch Road based upon the condition of the cut made across T ony’s Branch Road at the time of the incident described herein above. Claimants contend that respondent failed to remedy the depression of the cut even though respondent had adequate notice that it posed a danger to the traveling public on Tony’s Branch Road; that respondent failed to warn motorists of the area of the cut; and that the work performed at the cut by respondent was not done in accordance with proper engineering methods.
Respondent asserts that although there was a cut in Tony’s Branch Road, it did not pose any danger to the traveling public. It further asserts that the accident which occurred was the result of negligence on the part of the claimant Mr. Brown in his operation of a motorcycle with which he was not familiar.
During the hearing of this claim, several witnesses who lived on Tony’s Branch Road testified as to the work done on the road at the location of the cut and the depth of the cut below existing pavement level on the date of claimant Mr. Brown’s accident. Beverly Milam, a resident ofTony’s Branch Road and a school bus driver, testified that she is very familiar with Tony’s Branch Road since she drives over the road on a daily basis. She stated that she made a telephone call to personnel at respondent’s office in Rock Creek because there were problems on a bridge in the area and with the cut on Tony’s Branch Road. After her telephone call, employees placed gravel at the bridge and at the site of the cut. She made a second telephone call to complain about the cut specifically because in her opinion “it was a hazard.” She explained to the Court that she had to stop her school bus to cross the cut in the road because it was too deep. She described the cut as having a depth of four (4) inches, a width of one and a half to two feet and that it crossed both lanes of the road. She remembered that there was gravel and pavement in the cut, but the depression at the cut continued to exist even at the time of claimant Mr. Brown’s accident. She went to the scene of the accident on the night of June 5, 1999, and thought that the time was between 9:30 and 10:00 p.m. Another resident ofTony’s Branch Road at the time of the incident, Angela Begler, testified that *33 at the time of Mr. Brown ’ s accident she was familiar with the road and the cut on T ony’s Branch Road. She stated that the cut was made by respondent about a month before claimant Mr. Brown’s accident. She remembered that the “rut” across the road was about one and a half to two feet wide and four to five inches deep. She testified that she had called respondent’s office in Madison to complain that vehicles were dragging and that somebody was going to get hurt. She also stated that from her observations a driver had to come to a complete stop to go across the “hole.” Since she drove a truck, her vehicle did not drag in that area. She further testified that respondent placed more gravel in the cut, but it did not solve the problem.
Cecil Brown, claimant James Brown’s brother and a resident of Tony’s Branch Road at the time, testified that he made a video recording of the accident scene on June 6,1999, the day after the accident. The video was admitted in evidence. He testified that the cut was made for the installation of a culvert pipe and that gravel was placed over the pipe. He described it as a “gravel tar” and it bounced out of the hole. He went to the accident scene shortly after the accident where he observed his brother and it was his opinion that he had been thrown off the motorcycle.
The owner of the motorcycle being ridden by claimant James Brown on June 5, 1999, was Paul Foster, a coworker. His motorcycle, a 1991 Harley Davidson, did not have a crash bar or a windshield. He arrived at the party that evening around dusk and he stated that claimant James Brown asked permission to ride his motorcycle so he let him take it for a ride. He stated that claimant James Brown did not appear to be impaired or inebriated. In fact he stated, “If I thought he was, you know, drunk I wouldn’t have let him rode (sic) my bike.” He observed him riding by the site of the party and he estimated his speed at 25 to 30 miles per hour. It was getting dark and soon thereafter an individual identified as Shane Harper came to the party to inform the participants that “Jamie Brown had wrecked down in the hollow.” Mr. Foster testified that he went to the accident scene where he observed the claimant James Brown some ten to twelve feet from the motorcycle which was laying in the ditch. It was quite dark by that time so he could barely see the claimant James Brown who was lying on the ground. He also testified that he had encountered the cut in the road on his way to the party on his motorcycle. He was about twenty feet from the cut when he saw it; he was traveling at about fifty miles per hour, but he braked his motorcycle to about twenty-five to thirty miles per hour; he was able to maneuver the motorcycle across the cut, but he stated that he “had a pretty big jolt from it.” There were no warning signs at the area of the cut. He estimated the depth of the cut at anywhere from two to six inches with the deeper area being in the lane over which the claimant James Brown was traveling on his return to the party. He also stated that the accident scene is about one mile from the location of the party.
George Milam, a former employee of the respondent and one of the employees who worked on the cut on Tony’s Branch Road in April or May 1999, testified that in 1999 he was employed as a crew chief for respondent at the Seth office in Boone County. He stated that Tony’s Branch Road is a paved, secondary road without markings. He testified as to the procedure used by respondent in the installation of the culvert on Tony’s Branch Road since he supervised the employees during the time that two fifteen inch culverts were installed across Tony’s Branch Road. The culverts were placed in a ditch that was forty feet in length across the road, twenty-eight inches wide, and twenty-eight to thirty inches deep. After the culverts were placed in the ditch, crusher run limestone was used to cover the culverts and it was tamped in place with the backhoe. He explained that asphalt would normally be laid over the gravel after four or five days, *34 but it was not laid over the area on Tony’s Branch Road as the new supervisor in Boone County did not give direction for this to be done. He was aware of several complaints about the cut when the gravel settled into the ditch. He would tell the people to call the Boone County Headquarters about their complaints. He testified that the gravel inthe cut area settled approximately four or five inches below the level of the pavement of Tony’s Branch Road. There were no warning signs placed at the location of this cut. He stated that he was at the party on the evening that claimant James Brown had his accident and that he went to the accident scene.
Claimant James Brown testified about the circumstances of his motorcycle accident. He described driving to the party on Tony’s Branch Road on the evening of June 5,1999. He, his wife, his brother and his sister-in-law went to the party together in his Chevrolet Blazer and they arrived there at approximately 7:00 p.m. He did not eat anything since he had eaten dinner at his own home earlier. Although he drove over the cut on Tony’s Branch Road on the way to the party in his Blazer, he did not notice it at that tune. Although he had driven on Tony’s Branch Road on previous occasions, be had not chiven there during the time the cut existed on the road until this evening. He did not see any warning signs about the cut as he drove by the area on the way to the party. He stated that he had brought beer to the party and he drank two or three beers prior to riding the motorcycle which belonged to a coworker also attending the party. He was candid in stating that he had not ridden on a motorcycle in some years, that he did not have a helmet on at the time he had the accident, and that he requested Paul Foster to allow him to take a ride on the motorcycle. He described the route of his ride on the motorcycle as follows: he first rode to the dead-end of the hollow on Tony’s Branch Road where he turned around; he then rode past the site of the party toward the Route 3 intersection; he rode over the cut area on his way toward Route 3, but he did not notice it as being a bad area; he then turned the motorcycle around in a yard to drive back to the paxty when the accident occurred. He described what occurred as follows: “...when I turned around and was coming back in the hollow it was aggressive (referring to the cut area when the motorcycle stmck it). The bike bottomed out and I bobbled. I had my feet off the peg[s] ‘cause I knowed (sic) I was going to dump this boy’s bike. I just knowed (sic) it when I hit that. That’s the reason I had my feet up to try to hold myself and that’s the reason that I traveled instead of stopping. I didn’t have my feet on the brakes because it hit me so hard.” He traveled on the motorcycle about one hundred eighty-one(181) feet from the cut in the road to the ditch, then seventy (70) feet in the ditch to his left. He was lying ten (10) to twelve (12) feet from the ditch on a bank above the road. He remembers that the motorcycle was on him when he fell from the motorcycle and he knew that be was injured since he felt paralyzed. He stated that he remembered the people from the paity arriving at the scene and talking to them. An ambulance arrived at the scene and he was taken to the trauma center at the General Division of Charleston Area Medical Center in Charleston, Kanawha County.
The investigating officer for claimant James Brown’s accident was Danny McNeely, Deputy Sheriff for the Boone County Sheriff’s Office. He received notice of the accident on Tony’s Branch Road at approximately 9:50 p.m. and he immediately went to the scene. When he airived, the emei'gency personnel were treating claimant James Brown so he was unable to talk to him about the circumstances of the accident. He took measurements of the area and noted the distance from the time Mr. Brown drove the motorcycle into the ditch to where the motorcycle stopped seventy (70) feet as well as the distance Mr. Brown himself evidently landed away from the motorcycle twelve (12) feet. He noted these distances on his office report in the drawing of the accident scene. *35 On his report, Deputy McNeely marked the section for “Contributing Circumstances” of the accident on the part of the driver, “Failure to Maintain Control.” He based this conclusion upon statements he heard at the scene by by-standers who were making voluntary comments that Mr. Brown was unfamiliar with riding on a motorcycle and the fact that the motorcycle left the roadway on the opposite side of the road from the lane in which he was traveling. He stated, “It was just obvious that he lost control of the motorcycle or else he wouldn’t have wrecked.” The Deputy later interviewed claimant James Brown at the hospital where he took a statement and recorded that statement in his report as follows: “Driver states he went down the road and turned and started back up the hollow. He states that he was not going fast but was changing gears on the motorcycle and crossed a rough section of road and lost control and ran in the ditch.” When Deputy McNeely was later contacted by an investigator for respondent and they returned to the accident scene, he measured the distance from a dark area of pavement which he assumed was the ditch referred to as the “rough section of road” mentioned by claimant James Brown in his statement to the area of the ditch where the motorcycle left the paved portion of the road. This measurement was one hundred eighty-one (181) feet.
The Court first will address the issue of liability in this claim. The claimant James Brown is an individual who was not familial-with the Harley Davidson motorcycle he was taking for a ride on Tony ’ s Branch Road with which he was not very familiar. He had driven on this stretch of road on the way to a party with three passengers and he drove over the cut across Tony’s Branch Road created by respondent at least a month prior to June 5, 1999. He was at the party a couple of hours during which time he consumed two to three beers. He then requested permission to ride on the Harley Davidson motorcycle and he drove off. It was dark by this time of the evening (9:00 to 9:30 p.m.) and he proceeded to the dead-end of Tony’s Branch Road where he turned around and drove back passing the location of the party and toward the intersection of Tony’s Branch Road and State Route 3. He crossed the cut in Tony’s Branch Road with the motorcycle on the side of the cut that was not very deep. (The video in evidence reveals that the cut was deeper on one side of the road than the other and this fact was borne out by statements from the various witnesses.) He thereupon proceeded a short distance further (maybe a quarter of a mile or a little more according to his testimony) and turned around on the motorcycle to return to the party concluding his ride on the motorcycle. On this return trip he again came to the cut across the roadway only the motorcycle struck a deeper section of the cut (anywhere from four to six inches deep according to testimony from witnesses) and the motorcycle “bobbled” him. His feet were off the pegs and he tried to gain control of the motorcycle which was a natural reaction. He did not want the motorcycle to fall over with him and get damaged since it was not his motorcycle. Thus, a driver on a strange motorcycle was being propelled down the road while he tried to gain control. It is logical to believe that he twisted the throttle for gas control which would explain the distance he went of some one hundred eighty-one (181) feet before the motorcycle went into the ditch on his left across the road from his lane of travel. The motorcycle then traveled seventy (70) feet before turning over and the claimant James Brown either fell beneath it or was thrown from it. (The testimony differed among the witnesses.) The motorcycle was twelve (12) feet from him, perhaps because after the accident, the first people at the scene moved it off of him and parked it along the side of the road.
Taking into consideration all of the evidence in this claim, the Court concludes that the cut made by respondent across Tony’s Branch Road was the proximate cause of *36 the accident which is the subject matter of this claim. The testimony from witnesses in this claim establishes that respondent created a hazard on Tony’s Branch Road when it failed to pave the cut area in a timely manner or to place warning signs or to monitor the cut with the knowledge that the gravel placed in the cut would naturally settle. A settlement of anywhere from two to six inches is not unusual for a cut made across the entire width of a road. Traffic proceeding over the gravel will put ruts in the gravel. The expert witness for the claimants, Victor Dozzi, explained to the Court that limestone crasher ran (the kind of gravel placed by respondent over the culverts installed in the cut area on Tony’s Branch Road) is a mixture of one and a quarter (1 1/4) inch limestone with smaller particles so that the material actually binds together when it is tamped down. He was of the opinion that the material should have been placed in layers and tamped down layer by layer. The Court agrees that this is probably the preferred engineering technique, but the Court also recognizes that this is an impractical requirement for respondent’s employees on small cuts such as the one herein. However, nothing in the record absolves respondent of its duty to maintain a cut such as this one by laying asphalt over the gravel in a timely manner, or in the alternative, monitoring the settlement of the gravel so that additional gravel is placed to prevent a hazardous condition for travelers using the road. At the least, respondent could have placed a warning sign to alert drivers not familiar with the area about the uneven surface or dip at the cut.
In previous claims considered by this Court, the Court found negligence on the part of the respondent in claims where a cut was made by respondent across the width of a roadway or part of the roadway and the evidence established that respondent failed to maintain the area such that it was maintained at the level of the existing pavement. (See Hale v. Dept. of Highways 11 Ct. Cl. 93 (1976), Withrow v. Dept. of Highways 17 Ct. Cl. 47 (1987), Boyle v. Division of Highways 19 Ct. Cl. 103 (1992).) Thus, the conclusion of the Court herein is that respondent was negligent in its maintenance of T ony’s Branch Road and this decision is in accordance with previous decisions. The issue of liability having been established by claimants in this action, the Court must now consider the comparative negligence of claimant James Brown in his operation of the motorcycle, if any.
The Court has determined that claimant James Brown must bear some responsibility for the accident which occurred on Tony’s Branch Road resulting in his injuries. He was riding an unfamiliar motorcycle and he should have been more aware of his surroundings as he rode on Tony’s Branch Road. He did not wear a helmet as required by law in our State. W.Va. Code 17C-15-44(a) states as follows: “No person shall operate ... any motorcycle or motor-driven cycle unless the person is wearing securely fastened on his or her head by either a neck or chin strap a protective helmet designed to deflect blows, resist penetration and spread impact forces....” This violation of the law meant to protect operators of motorcycles must be taken into consideration by the Court when cal culating any measure of comparative negligence. However, the Court also is of the opinion that his comparative negligence does not approach the “equal to or greater than” threshold which would result in a denial of an award. The Court is of the opinion that claimant James Brown bears thirty-three and one-third percent (33 Vs%) of the responsibility for the accident herein and the injuries resulting therefrom; therefore, the award to him for his injuries will be reduced by this percentage.
Claimant James Brown, 33 years of age at the time of the accident and now 38 years of age, received serious personal injuries in this motorcycle accident. His current treating physician, Dr. Constantino Y. Amores, a neurosurgeon, testified that claimant James Brown sustained a cervical injury that resulted into a temporary paralysis. He was *37 in the hospital from June 6, 1999, to June 11, 1999, and then in rehabilitation from that date to June 18,1999. He was discharged after receiving rehabilitation during his initial hospital treatment. He wore a Minerva collar which is stiffer in nature than the normal collar used in neck injury patients. He suffered a slight herniation of the disc between two vertebrae in his neck. He also had a maxillary fracture for which he was treated by a plastic surgeon. Dr. Amores testified that he last saw claimant James Brown in February and April 2002. Mr. Brown had complaints about the pain in his neck area which is subjective in nature, but according to Dr. Amores the complaints were credible. He stated that his prognosis for Mr. Brown’s physical condition from a neurological point of view was good.
Claimant James Brown described his injuries during the hearing. He suffered a neck injury as mentioned herein above, injury to his front teeth and to his face, as well as a laceration to his chest which required stitches, and a four to six inch cut on the left side of his knee cap on his right leg. His medical bills totaled $38,733.12 of which amount he paid $280.16. He is a truck driver for a coal hauling company. He suffers with pain which is continuing in nature and which has affected his ability to perform the normal activities in which he engaged prior to the accident. His life style has changed as a result of his injuries. He is not able to enjoy the same sports activities such as hunting, fishing, volley ball games, badminton games, etc. He has been unable to play with his two children as he once did. He stated that the pain he experiences is “severe” at least once a week. He lost work from June 5, 1999, to December 28, 1999, when he returned to work for light work duty only. He incurred a loss of wages in the amount of $17,744.00 during 1999 as a result of the motorcycle accident.
Claimant Angela Brown testified about the differences in her husband’s life style. She substantiated his testimony about his inability to enjoy sports activities or interact with his children as he had prior to the motorcycle accident. She also stated that she observes him when he experiences pain after driving a track all day. She was candid in her testimony about her observations of her husband.
The Court is of the opinion that claimant James Brown may recover $280.16 in medical expenses, $17,744.00 in lost wages, and $98,000.00 for his pain and suffering in the past and the future for a total amount of damages of $ 116,024.16 which amount is reduced by thirty three and one-third percent (3 3 Vs%) for his comparative negligence in accordance with the decision ofthe Court. The Court makes an award to claimant Angela Brown in the amount of $5,000.00. The Court declines to make awards to claimants Christine Brown and Tasha Brown since no damages are in evidence.
In accordance with the findings of fact and conclusions of law stated herein above, the Court makes an award to claimant James Brown in the amount of $77,353.31, and an award to Angela Brown in the amount of $5,000.00.
Award to James Brown: $77,353.31.
Award to Angela Brown: $5,000.00.